SAUGATUCK BRIDGE COMPANY *vs.* THE TOWN OF WESTPORT.

The plaintiffs were incorporated for the purpose of erecting a toll bridge, with a provision that the town of *W* should have the right, at a price agreed or at an appraisal, " to purchase said bridge and the franchise of said company, at any time after the bridge was completed and open for travel." Held that contract made by the town before the bridge was built, to purchase the bridge on its completion, was valid.

The charter provided that the capital of the corporation should not exceed $30,000, and that certain commissioners named should receive subscriptions to the stock in a book opened for the purpose, at a time and place of which public notice should be given in one or more newspapers, and that when stock sufficient for the construction of the bridge was subscribed they should distribute it among the subscribers and appoint the first meeting of the corporation. As a matter of fact the stock subscribed was not sufficient by itself for the construction of the bridge, though taken in connection with the contract of the town to purchase and pay for the bridge, it was sufficient. The commissioners, treating it as sufficient, distributed the stock among the subscribers and called the first meeting of the corporation. · Held that the question whether the stock was sufficient was wholly one for the commissioners to decide.

And held that, as the town contracted with the corporation to purchase the bridge with full knowledge of the amount of stock that had been subscribed, it had no right to complain.

Held also that notice published in a daily paper issued in the afternoon on the 24th of December, that the commissioners would hold a meeting during the 24th, 25th, and 26th days of December, to receive subscriptions to the stock, was sufficient.

And that the action of the commissioners was not invalidated by the fact that they did not attend personally during the time the books were open for subscriptions, but left them in charge of another person, and only attended for final action after the subscriptions were all made.

The plaintiffs procured a third party to build the bridge and assigned to him their contract with the town as security for payment. Held that an action against the town on the contract was properly brought in the name of the plaintiffs.

The statute which allows an assignee of a chose in action to sue upon it in his own name, does not preclude the bringing of an action in the name of the assignor.

The plaintiffs, when the bridge was completed, conveyed to the town the bridge and their corporate franchise, according to their contract and the provisions of the charter. Held that the legal existence of the plaintiffs as a corporation remained, and that they could maintain a suit.

And held that the case was not affected by the fact that the river, over which the bridge was constructed, was a navigable stream.

ASSUMPSIT upon a contract of the defendant town to pur-

chase and pay for a bridge. erected by the plaintiffs; brought to the Superior Court in Fairfield County.

The declaration alleged that the plaintiffs were incorporated by the General Assembly of the state of Connecticut in the .year 1866, for the purpose of erecting a toll bridge over the Saugatuck river in the town of Westport, their charter containing the following provision: " Provided further that the town of Westport shall have the right to purchase said bridge and the franchise of said company, at any time after the completion of said bridge and the opening of the same for public travel, at a fair valuation, and in the event said town and said company cannot agree as to the value of said bridge and franchise, then either party may apply to a judge &c.; " that the town of Westport, upon the organization of the corporation, voted in a legal town meeting to purchase the bridge when completed and open for travel for $21,000, and appointed a committee to make a contract with the plaintiffs to that effect, and to receive a conveyance of the bridge when completed and of the franchise of the plaintiffs; that the contract was immediately afterwards executed by the plaintiffs and the committee of the town; that the bridge was built by the plaintiffs, and when completed and open for travel was conveyed by them, with their corporate franchise, to the town, by deed duly executed, which deed was delivered to the committee of the town and by them accepted on behalf of the town; and that the defendants, though requested, had refused to pay the amount provided for in the contract.

The defendants pleaded the following matters in abatement of the writ:

1. That the Saugatuck Bridge Company, at the time. of the commencement of the suit, was not and never had been legally organized under and.in pursuance of its charter, nor had ever been legally organized as a corporation under or·by virtue of any act of the General Assembly, or of any law whatever; and had no power whatever to institute or prosecute the suit.

2. That the Saugatuck Bridge Company on the 24th day

of February, 1869, assigned the contract with the defendants upon which the suit was brought, so far as they had power by law to assign the same, to Albert D. Briggs & Co., a partnership firm then and still of Springfield, in the state of Massachusetts, and that all the equitable interest of the Saugatuck Bridge Company in the contract thereby passed to and vested in the said Albert D. Briggs & Co., of which the defendants afterwards, and before the commencement of the suit, had notice; and that the equitable interest in the contract at the commencement of the suit and at the present time remained vested in said Albert D. Briggs & Co., and that the suit should not have been brought by the plaintiffs or in their name, but by the said Albert D. Briggs & Co., and in their own name.

The plaintiffs denied the allegations of the first part of the plea and demurred to those of the second part. The court, (*Loomis, J.,*) held the latter insufficient and found the following facts with regard to the former:

The Saugatuck Bridge Company was incorporated by resolution of the General Assembly, approved May 30th, 1866, the parts of which important to the present case are as follows:

" That Francis B. Cutting (and sundry others named) hereby are, with their successors and assigns, made a body politic and corporate, by the name of the Saugatuck Bridge Company, of Westport, for the purpose of constructing, and keeping up, over Saugatuck river, at the village of Saugatuck in said town of Westport, a bridge, with a suitable and convenient draw therein, not less than fifty feet wide, for the use and benefit of said company and the public, in one of the two places specified in the original petition, which shall be selected by a majority of the stockholders of said company, at a meeting of said stockholders called for that purpose by the first three corporators named in this charter, at such time and on such notice as to them shall seem reasonable and proper. * * * * That the capital stock of said corporation shall not exceed thirty thousand dollars, and that a share of said stock shall not exceed twenty-five dollars. * * * * That the commis-

sioners to be appointed on said bridge shall give public notice in one or more newspapers printed in Bridgeport, of the time when and the place where the books of subscription to the stock of said company shall be opened, and that whenever the stock necessary for the construction of said bridge is subscribed, they shall distribute the same, and shall give public notice through one of the newspapers printed in Bridgeport of the first meeting of said corporation. That when said bridge is completed, the said company may erect a toll-gate, at such convenient place on said bridge, or at either extremity thereof as the directors may elect, and collect at such toll-gate the following rates of toll, &c. * * * * Provided that the town of Westport shall have the right to purchase said bridge and the franchise of said company at any time after the completion of said bridge, and the opening of the same for public travel, at a fair valuation; and in the event said town and said company cannot agree as to the value of said bridge and franchise, then either party may apply to a judge of the Superior Court, capable in law of judging between the parties, who shall appoint three disinterested persons, freeholders, not residents of said town of Westport, who shall value said bridge and franchise, and whose judgment in said matter shall be final, and said town shall give and said company take the sum which shall be thus fixed for said bridge and franchise."

Commissioners on the bridge were appointed at the same session of the General Assembly. On the 23d day of December, 1868, the commissioners issued a notice that books of subscription to the capital stock of the bridge company would be open at the store of E. S. Wheeler & Co., from the 24th day of December, 1868, to the 26th day of December, 1868, both days inclusive. The notice was dated the 23d day of December, 1868, and the commissioners caused the same to be published in a daily newspaper printed in Bridgeport, on the 24th day of December, 1868, and issued in the afternoon of that day, which was the only publication of the notice. The store of E. S. Wheeler & Co. was in the town of Westport. Books of subscription to the capital stock of the company

were opened in accordance with the notice, and seventy-three shares of stock were subscribed for, several persons subscribing for the same. On the 28th day of December, 1868, the commissioners distributed the stock to the subscribers therefor, and on the same day caused to be published in one of the newspapers in Bridgeport, a notice of the first meeting of the stockholders, which meeting was holden pursuant to the notice, on the 31st day of December, 1868, at which meeting three directors of the company were elected. A meeting of the directors of the company was holden on the 20th day of January, 1869, at which a president, treasurer and secretary were appointed, and by-laws were adopted. On the 1st day of May, 1869, a meeting of the stockholders was called by the first three corporators named in the charter for the purpose of selecting the place at which the bridge should be built over Saugatuck river. The meeting was held pursuant to the notice, and the northern one of the two places specified in the petition for an act of incorporation, was selected by a majority of the stockholders as the place where the bridge should be built. The company afterwards proceeded to construct a bridge at the place so fixed upon, which before the commencement of the action was completed and open for public travel, and was constructed pursuant to the requirements of the act of incorporation.

On the 24th day of February, 1869, and before the company commenced the construction of the bridge, the votes below given were passed at a town meeting of the town of Westport, legally warned for that purpose, and on the same day the committee appointed by the votes, entered into a written contract with the bridge company for the purchase by the town of the bridge and franchise, when the bridge should be completed and open for public travel. The votes were as follows :

" *Voted.* That this town will purchase the franchise and bridge of the Saugatuck Bridge Company when the same shall be completed and open for public travel, at and for the sum of $21,000.

" *Voted.* That Erastus P. Smith, Gershom B. Bradley, and William E. Dikeman be, and they are hereby appointed,

a committee to make a contract with the bridge company, for the purchase of the franchise and bridge of said company, when completed and open for public travel; and execute and receive in behalf of the town the proper and necessary conveyance to transfer said franchise and bridge when completed and open as aforesaid, to said town, for the sum aforesaid.

" *Voted.* That the selectmen of this town be, and they are hereby directed to draw their orders on the treasurer of the town, in such sums and payable to such person or persons as said committee shall direct, not to exceed the sum of $21,000, immediately at the request of said committee, on the completion of said bridge, and the opening of the same for public travel, and the conveyance of the same to this town.

" *Voted.* That the bridge aforesaid be located at the north point mentioned in the petition to the legislature for the charter of said company."

The par value of the capital shares of the company was fixed by a vote of the company at the sum of twenty-five dollars each.

Upon the trial the defendants offered evidence to prove that the stock of the company which had been subscribed was insufficient for the construction of a suitable bridge under the charter, which evidence was objected to by the plaintiffs and rejected by the court.

The defendants claimed that the plaintiffs were not at the time of the commencement of the suit legally organized as a corporation, because the notice given by the commissioners of the time and place when and where the books of subscription to the stock would be opened, was insufficient under the charter, by reason of the same not having been published till the 24th of December, 1868, and also because stock necessary for the construction of a bridge under the charter had not been subscribed, and requested the court so to decide; but the court held that, upon the facts found, the plaintiffs were, as against the defendants, a legally organized corporation, and had the right to maintain a suit.

The court therefore overruled the plea in abatement and ordered the defendants to answer over to the action. They

thereupon pleaded the general issue, with notice of sundry matters of defence, the issue being closed to the court. At a later term the case was heard upon this issue before *Phelps*, J., who found the following additional facts :

The plaintiffs at a stockholders' meeting on the 13th of November, 1869, voted to sell its franchise and bridge and the land connected therewith, to the defendants, for the sum of $21,000, and authorized its president to convey the same to the defendants.

The bridge was well and substantially built, with a safe and sufficient draw of fifty feet span, in all respects according to a certain plan and specifications in writing which were read and explained in the meeting of the town, and was fully completed and opened to public travel in the month of November, 1869. No false or improper representations or inducements were made or offered in the meeting by any one in behalf of the plaintiffs, and the price agreed to be paid by the defendants to the plaintiffs for the franchise and bridge was a fair valuation of the same. The bridge is connected with, and an essential part of, an important public thoroug^ ^ and is convenient and necessary for the public, and espe. ly for a large number of the inhabitants of the town of Westport, and is of itself of the value of $21,000.

Soon after the completion and opening of the bridge to public travel, the plaintiffs, in pursuance of the contract, executed a proper deed to the defendants conveying the franchise and bridge, and delivered the same to the committee of the town, who accepted the same on behalf of the town, and tendered the same to the selectmen of the town, and requested them to draw the necessary orders on the town treasurer for the sum of $21,000, in payment for the franchise and bridge. But the selectmen refused to receive the deed, and to draw the orders.

Immediately after the execution of the contract with the defendants, the plaintiffs contracted with A. D. Briggs & Co. for the construction of the bridge for $21,000, and assigned to them their contract with the town as collateral security

for the performance by the plaintiffs of their contract with them, and Briggs & Co. have ever since been, and now are the holders of the contract for the above purpose.

The plaintiffs would have made no contract with Briggs & Co. to construct the bridge, and would not have been able to construct it, or contract for its construction, but for the vote and agreement of the defendants to purchase it when completed; and the agreement and vote of the defendants operated to induce, and did induce, the plaintiffs to make their contract with Briggs & Co., and thereby to procure the erection of the bridge. Upon the completion of the bridge, and before the conveyance thereof by the plaintiffs to the defendants, Briggs & Co. delivered the same to the plaintiffs, and the same passed into their hands.

The commissioners to distribute the plaintiffs' stock resided several miles from Westport, and were not present on either of the days appointed for receiving subscriptions, and did not personally receive such subscriptions, and the only knowledge they had of what was done in relation thereto was derived from the paper containing the subscriptions which was afterwards delivered to them by J. E. Wheeler, a director of the plaintiffs' company; but Wheeler had been requested by the commissioners to act for them in receiving the subscriptions, and in pursuance of their request did so act, and his acts were ratified and adopted by the commissioners, but they did not in fact sign the certificate of the distribution of the stock made by them until after the contract between the plaintiffs and defendants had been made, and an injunction had been obtained by one of the tax-payers of the town against the drawing of any order for the $21,000 or any part of it by the selectmen of the town in favor of the plaintiffs, or the payment of the $21,000 or any part of it by the town to the plaintiffs in any form.

The shares of stock subscribed and distributed were insufficient to build a suitable bridge, and this was known to the commissioners and the plaintiffs at the time the contract between the plaintiffs and the town was made, and nothing was done towards the construction of the bridge until the contract was

made, and no part of the contract price for the bridge has yet been paid to, or received by Briggs & Co.

The Saugatuck river, at the place where the bridge is constructed, is a navigable stream, and a valuable commerce with New York and elsewhere is prosecuted upon it with vessels of the burthen of two hundred tons and less. The New York & New Haven Railroad Company have a bridge with the same width of draw in it, across the river, below the bridge in question.

The defendants objected to all the evidence of the plaintiffs, as the same was offered, to prove the foregoing facts, but the court admitted it, and on the above facts rendered judgment for the plaintiffs to recover the $21,000 provided for in the contract with interest. The defendants thereupon filed a motion in error and a motion for a new trial.

*Sturges* and *T. E. Doolittle* in support of the motions.

*Beardsley* and *E. W. Seymour*, with whom was *M. W. Seymour*, contra.

PARK, J. The objections raised by the defendants are all of a technical character. The plaintiffs were chartered for the purpose of constructing a bridge over Saugatuck river. To compensate them for the trouble and money expended in such construction, the legislature empowered them to take certain tolls from travelers unless the defendants should elect to purchase the bridge when completed, in which case they were authorized so to do at a fair valuation, if the parties could not otherwise agree upon the compensation to be paid.

These facts rendered it obvious that if the town avail itself of the privilege granted, there could be but little inducement on the part of the corporation to be organized to go forward and construct the bridge, for in so doing they would be merely the builders for the town, and would be compelled to take as compensation whatever appraisement three disinterested freeholders should award them, whether more or less than the expense of construction. It would seem that the chances of gain were no more than equal to the risk of loss, and in this

state of things it could hardly be otherwise than that the plaintiffs would be anxious to know in advance whether the defendants intended to take the bridge from them as soon as completed; and, on the part of the defendants too, one would naturally suppose that there would be an inclination to determine thus early their optional privilege, in order that they might have a voice in determining the location, style, and general character of the bridge, if they were to purchase it. It was manifestly for the interest of both the parties that this question should be determined by the town in advance of construction; and because they acted with seeming wisdom and discretion in the matter and made a contract with the plaintiffs binding themselves to purchase the bridge at a certain price when completed and open to public travel, their action is made the chief ground of complaint in the present case. It is said that the town had no power to purchase, or bind itself by contract to purchase, before the bridge was completed; that the charter substantially so declares, in order that the inhabitants of the town might have an opportunity to inspect the bridge, and observe the amount of public travel over it, so that they could act intelligently upon the question whether it was expedient for them to purchase or not; as well as ascertain the value of the bridge. .

The provision of the charter under which this claim is made is as follows; " And provided further, that the town of Westport shall have the right to purchase said bridge and the franchise of said company at any time after the completion of said bridge and the opening of the same for public travel, &c."

The defendants construe this provision as declaring, by necessary intendment, that the town shall have no power to purchase the bridge before its completion, and of course no power to bind itself by contract to make the purchase until such completion.

If the legislature had intended by the language used what the defendants claim, and for the reasons which they suppose, it is strange that the town should have been authorized to purchase the bridge as soon as completed and open to public travel, which would be long before the inhabitants would have

been able to ascertain the amount of travel over it by use, or have had a fair opportunity to form a judgment as to its value by inspection. And furthermore, the town had all the means of ascertaining in advance of construction whether the bridge would be necessary for public travel, and what the cost of it would be, that towns ever have in regard to highways that they are called upon to lay out and construct for public use. Questions of this character can, in most cases, be as easily determined beforehand as afterwards.

We think the language of the charter was not intended to be construed in its strict literal sense in regard to the time when the town might purchase, or bind itself by contract to do so, when manifestly it was for the interest of both the parties that the decision should be made before the bridge was constructed. The legislature seem to have taken it for granted that inasmuch as they were chartering the plaintiffs for the express purpose of constructing the bridge, with the optional right of purchase on the part of the town, the plaintiffs would at all events construct the bridge; and to have used the language with this fact in mind, and without intending anything more by it than simply to give the town the optional right of purchase. And even if the charter is to be construed strictly, we do not see that the act of the defendants is unauthorized by its provisions, for they did not in fact purchase the bridge before its completion, but only bound themselves by contract to purchase it when it should be completed. We think this claim of the defendants is untenable.

But it is said that the commissioners did not perform their duty under the charter and that consequently the plaintiffs were not legally organized as a corporation. The charter provides that the commissioners shall give public notice, in one or more newspapers printed in Bridgeport, of the time when and place where the books of subscription to the stock of the company should be opened, and that whenever the stock necessary to the construction of the bridge should be subscribed, they should distribute the same, and should give notice in one of the newspapers printed in Bridgeport of the first meeting of the corporation. This requirement of the charter with

regard to the amount of stock to be subscribed, it is claimed was not complied with. It is said that stock necessary for the construction of the bridge was never subscribed and that the Superior Court has so found; and that therefore the commissioners had no authority to distribute the stock, or call the first meeting of the corporation.

But who is to determine when stock sufficient for the construction of the bridge has been subscribed? Different tribunals may differ widely upon the question. The commissioners may have one opinion upon the subject, and the Superior Court quite another. Which is to determine the matter; Manifestly the question is left by the charter to the commissioners to determine. They are to distribute the stock, and call the first meeting of the corporation, when in their judgment sufficient stock has been subscribed for the construction of the bridge. But it is said that they knew that sufficient stock had not been subscribed, when they distributed the stock. They may have known that the stock taken by itself would not be sufficient to build the bridge, but have been satisfied that the stock taken in connection with the contemplated contract with the defendants to purchase the bridge when completed, would be sufficient for the purpose as subsequent events proved it to be, for the plaintiffs were in fact able to construct the bridge with their seventy-three shares of stock, and did construct it in accordance with their contract with the defendants. It was doubtless this consideration that induced the commissioners to regard the seventy-three shares of stock as sufficient under the circumstances. And it was probably the action of the town with reference to taking the bridge when completed, that prevented the taking of more stock in the corporation. Monied men would not embark in an enterprise like this, where they might be merely the builders of a bridge for the town, and be liable to have it taken from them by appraisement, as soon as completed. It seems to come with poor grace from the defendants to complain of what was caused by their own action, and especially when they have received all that they bargained for, and all that they could possibly have received if the utmost amount

of stock that the charter allowed had been taken; and still more when they knew at the time they agreed to purchase the bridge, that seventy-three shares of stock were all that had been taken. They made their contract with full knowledge of what they now complain of, and we think they must abide by their contract so far as this claim is concerned.

Complaint is also made of the notice given by the commissioners of the time when the books of subscription to the capital stock of the corporation would be open, and the manner in which the commissioners received subscriptions to the stock. These claims are untenable, and need no consideration.

It is further claimed that no right of action existed in the plaintiffs at the time this suit was brought; because in the first place, they had assigned all their interest in the contract made by them with the defendants, to Briggs & Co.; and, in the second place, if any interest remained in the plaintiffs after such assignment, it was conveyed to the defendants by their deed transferring the bridge and their franchise to them.

The court has found that the plaintiffs assigned the contract to Briggs & Co., as collateral security for the faithful performance on their part of a contract made by them with Briggs & Co., for the construction of the bridge. Surely such an assignment would not transfer all the plaintiffs interest in the contract to Briggs & Co. Suppose the latter had agreed with the plaintiffs to construct the bridge for the sum of ten thousand dollars. It would then be manifest that all the interest of the plaintiffs in the contract would not have been transferred; and can the amount of the sum secured by the assignment make any difference, farther than to show the extent of the equitable interest? The legal interest in the contract would remain in the plaintiffs, however great might be the equitable interest in Briggs & Co.; and it would so remain notwithstanding the statute that allows an assignee, by making certain allegations in his declaration and proving them on the trial to maintain an action in his own name. The statute was never intended to supersede the bringing of

actions in the name of the assignor, but only to afford an additional mode of proceedure, if the assignee should choose to adopt it. We think there is nothing in this claim of the defendants ; nor do we think that the deed given by the plaintiffs to the defendants, transferring to them the bridge, and their corporate franchise deprived the plaintiffs of the right to sue on the contract. The plaintiffs were bound to be ready and willing to transfer the bridge and their franchise under the contract, and to tender the same for the acceptance of the defendants on condition of payment, unless payment had been absolutely refused ; and the fact, that the plaintiffs did more perhaps than was necessary under the contract, in order to entitle them to sue for the contract price of the bridge, could not deprive them of their legal existence as a corporation. Their corporate existence would remain notwithstanding such transfer, until the affairs of the corporation were settled. The creditors of a corporation would otherwise often be remediless.

It is further claimed that Saugatuck river is a navigable stream at the place where the bridge was erected, and that the defendants had no right under the general statutes of the state to construct a bridge over this stream. The case of *Brown* v. *Towns of Preston & Ledyard*, 38 Conn., 219, decides the contrary ; besides which the plaintiffs' charter expressly authorized them to construct a bridge across this river for public use ; and empowered the defendants to purchase the same when constructed and open to public travel. The defendants decided to purchase according to the terms of the charter. They thereby substantially decided that the bridge would be convenient and necessary for public use. How could it be otherwise ? The defendants had no right to make the purchase for other purposes than for public use. The charter by necessary intendment so declares ; and by such intendment further declares that the defendants shall have the right to purchase the bridge provided they shall deem it necessary and convenient for public use. When therefore the defendants decided to purchase the bridge they intended to decide, and did, in fact decide that the bridge would be con-

venient and necessary for public use; and their decision was as final and conclusive upon the question as like decisions are in the lay-out of public highways. The charter therefore impliedly authorized the bridging of this river by the town·· through the instrumentality of the plaintiffs if the town should elect to purchase the bridge.

In conclusion we say that the defendants, having made a contract with the plaintiffs to purchase the bridge and franchise, when the bridge should be completed and open to public travel, as authorized by the plaintiffs' charter; and the plaintiffs having constructed the bridge in accordance with the terms of the contract, and having conveyed the same, together with their franchise, to the defendants, after the bridge was completed, and open to public travel; and the bridge and franchise having been accepted in behalf of the defendants by the committee appointed by the town for the purpose, the defendants must now abide by their contract, and pay the plaintiffs the amount stipulated therein.

There is no error in the judgment complained of, and a new trial is not advised.

In this opinion the other judges concurred; except SEYMOUR, J., who having been consulted in the case when at the bar. did not sit.